Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | | |
|---|---|---|
| HIQ LABS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 17-03301 EMC** |
| | ) | |
| LINKEDIN CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————— | ) | |
| | ) | |
| 3TAPS, INC., a Delaware | ) | |
| Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 18-00855 EMC** |
| | ) | |
| LINKEDIN CORPORATION, a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————— | ) | |

San Francisco, California
Thursday, April 8, 2021

<u>**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**</u>

<u>**APPEARANCES VIA ZOOM:**</u>

For Plaintiff hiQ Labs, Inc.:
                    QUINN, EMANUEL,URQUHART & SULLIVAN LLP
                    51 Madison Avenue, 22nd Floor
                    New York, New York 10010
            BY:   **RENITA N. SHARMA, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official U.S. Reporter

1    **APPEARANCES VIA ZOOM:**   (CONTINUED)

2    For Defendant:

3                                ORRICK, HERRINGTON & SUTCLIFFE LLP
                                 The Orrick Building
                                 405 Howard Street
4                                San Francisco, California 94105
                        BY:     **ANNETTE L. HURST, ATTORNEY AT LAW**
5                                **RUSSELL P. COHEN, ATTORNEY AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Thursday - April 8, 2021**</u>                                    <u>**2:07 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---o0o---**

1  **THE CLERK:**  Calling Civil Action 17-3301, hiQ Labs, Inc.

2  versus Linkedin Corporation, related to Civil Action 18-855.

3      Counsel, please state your appearances for the record,

4  beginning with counsel for plaintiff.

5      **MS. SHARMA:**  Your Honor, Renita Sharma for plaintiff and

6  counterclaim defendant hiQ Labs.

7      **THE COURT:**  All right.  Thank you, Ms. Sharma.

8      **MS. HURST:**  Good afternoon, Your Honor.  Annette Hurst on

9  behalf of LinkedIn.

10     **THE COURT:**  All right.  Good afternoon, Ms. Hurst.

11     **MR. COHEN:**  Good afternoon, Your Honor.  Russell Cohen on

12  behalf of the defendant LinkedIn.

13     **THE COURT:**  All right.  Thank you, Mr. Cohen.

14     Okay.  I guess still no word from the Supreme Court on the

15  cert petition in this matter?

16     **MS. SHARMA:**  That's correct, Your Honor.

17     **MS. HURST:**  That's correct.

18     **THE COURT:**  And the *Van Buren* case, remind me.  Has that

19  been argued?

20     **MS. HURST:**  It has been argued, Your Honor.  The next

21  currently known opinion release date is much later this month.

22  I think it's the 22nd.  So that would be the soonest next

1    opportunity, Your Honor.

2        **THE COURT:**  And what's your best guess in terms of -- I

3    know it's been -- I guess it's been held over a couple of

4    times -- in terms of the cert petition in this matter?  Is it

5    your guess that that may be held pending *Van Buren*, or what do

6    you think's -- what's your assessment?

7        **MS. HURST:**  Yeah.  Our assumption is, Your Honor, even

8    though no order issued saying it was being held pending

9    *Van Buren*, that that's, in fact, what's been happening.

10       **THE COURT:**  Okay.  Well, I mean, we could sort of get into

11   it and talk about sort of what's left after the Ninth Circuit's

12   decision and what's new here that would suggest there is a

13   claim under the CFAA; but it seems to me that it may make sense

14   to -- let's wait and see what the Court does.  I'm disinclined

15   to try to issue any definitive ruling yet without knowing

16   what's going to happen.

17       Unless somebody sees a good reason for the Court to

18   venture down this road right now, I don't, but I'll hear a

19   contrary view if there is one.

20       **MS. HURST:**  Well, Your Honor, I think that LinkedIn would

21   like to get its claims at issue so that if and when, you know,

22   there -- I believe the terms of the current stay are that once

23   the petition is acted upon, there's ten days to have initial

24   disclosures.  And, you know, Your Honor, if the claims are at

25   issue, then, of course, the scope of that will be known at that

1    time, rather than just letting the counterclaims be sitting out

2    there.

3          Of course, Your Honor, it is also our view that the Court

4    should not dismiss the CFAA claims.

5          But, of course, there are all the state law claims as well

6    that we've really never even had an opportunity to address,

7    Your Honor, and so we are prepared to address those as well in

8    our argument.

9          **THE COURT:**  Sure.  I mean, that's the point.  I start with

10   the Ninth Circuit's decision, which didn't definitively rule;

11   but certainly, there's a lot there that suggests that unless

12   there's some new facts, that the CFAA claim would not survive.

13   But that could change depending on what the Supreme Court does

14   in either of these cases, I assume.  That's why I'm reluctant.

15         I mean, frankly, if there were no appeal and we were sort

16   of here without the cert petition and without *Van Buren*,

17   I guess I would press you pretty hard, Ms. Hurst, as to why I

18   should sort of turn the tide here.  And maybe you have some

19   nuances here that you would want to push.  But I'm inclined to

20   really analyze this once the law is in.

21         Do you have a different view, Ms. Sharma?

22         **MS. SHARMA:**  No, Your Honor.  I think if the Court is

23   prepared to stay its decision until the Supreme Court rules on

24   *Van Buren* and the cert petition, we're comfortable with that.

25   As Ms. Hurst said, discovery is stayed in the matter pending

1   those things anyway.  So it probably won't impact the

2   proceeding of the case.

3        Obviously, if, you know, LinkedIn wants a dispositive

4   ruling that its CFAA claim survives under the current law,

5   that, I think, we would have some issue with because we think

6   that the current state of the Ninth Circuit's ruling, as you

7   indicated, really mandates the dismissal of the claim.

8        But if we're merely speaking about a stay until the

9   Supreme Court decides, we don't have any objection to that.

10       **THE COURT:**  Well, let me tell you where I'm sort of

11  headed.  I mean, I think the 502 claim under the Penal Code --

12  I understand it's different.  There's a distinction between the

13  CFAA and 502.  But I also believe that what may or may not be

14  said by the Supreme Court might have some influence on the

15  502 question as well.  And they're sort of somewhat parallel in

16  some ways, and some of the policy arguments overlap to a

17  certain degree.  I am inclined to put those on hold until we

18  get some resolution from the Supreme Court.

19       I am prepared to address the breach of contract, the

20  misappropriation, the unjust -- the trespass claim here.  And

21  so what I'd like to do is -- because I think they can be looked

22  at perhaps independent of the CFAA and the 502 claim to a

23  certain extent.  So I'd like to spend the next few moments

24  talking about that, talking about those claims.

25       So let's start with the breach of contract claim here.  It

1    seems to me the key is whether the user agreement -- which

2    states it applies to anybody who uses the website, not just to

3    subscribers -- whether that applies here, turns on the question

4    of knowledge.

5          This is not a clickwrap but something closer to a

6    browsewrap, and I think Ninth Circuit law makes the validity,

7    in application of a browsewrap contract, turn on whether

8    there's actual or constructive knowledge.  And it seems to me

9    that that is a fact-based question that would not be

10   appropriate to resolve; and therefore, my inclination is to say

11   that action at least has been stated for 12(b)(6) purposes,

12   without prejudice to factual development and perhaps revisiting

13   the merits of this question on a summary judgment or in some

14   other context.

15         So I'll put the burden on you, Ms. Sharma.  Why isn't this

16   at least a question that's more of a fact-based question about

17   the binding nature of the alleged user agreement?

18         **MS. SHARMA:**  Understood, Your Honor.

19         I think it's important, for this particular cause of

20   action, to know that hiQ is only moving to dismiss or strike

21   this claim in part.

22         So the claim alleges that hiQ violated the user agreement

23   from the outset of its access to LinkedIn and, also, that that

24   violation continues to this day.  LinkedIn seeks injunctive

25   relief in part because hiQ continues to breach the user

1    agreement by accessing LinkedIn in violation of the terms of

2    service.

3        It's that portion, the continuing portion, that we're

4    seeking to strike.  And the basis for that motion to strike is

5    that the ruling -- it's the ruling of this Court, as affirmed

6    by the Ninth Circuit.  Both courts held that hiQ is no longer

7    bound by the user agreement as LinkedIn has terminated hiQ's

8    status.  And so we think from the time of that ruling forward,

9    the claim should be struck.

10        I understand from the briefing that LinkedIn argues that

11   those citations and statements in the two rulings are not the

12   law of the case because, firstly, that rulings on the issue of

13   a preliminary injunction are not binding as to issues of fact.

14        As to that, Your Honor, we would say that it's black

15   letter law that whether a certain or undisputed statement of

16   facts establishes a contract is a question of law.  That's not

17   a question of fact.

18        And what this Court considered and what the Ninth Circuit

19   considered is whether continued access by hiQ after the Court's

20   ruling and after LinkedIn had terminated hiQ's user status

21   established a contract.  And the answer of both this Court and

22   the Ninth Circuit was no, that hiQ is no longer bound.

23        The second basis that LinkedIn articulates for deviating

24   from the ruling of this Court is that there are changed

25   circumstances present now.  And what they've said is that hiQ

1    has made the, quote, admission that it continues to access

2    LinkedIn data.

3         That's not a changed circumstance, Your Honor.  That was

4    the whole point of the preliminary injunction.  What hiQ sought

5    before this Court was the right to continue to access

6    LinkedIn's data.  So to point to that as the only changed

7    circumstance here, I think, shows why we think this claim can

8    be struck from the point of the preliminary injunction ruling

9    on.

10        **THE COURT:**  All right.  Your response, Ms. Hurst?

11        **MS. HURST:**  Yes, Your Honor.  The question of whether the

12   contract is terminated is a question of fact, and it was not

13   terminated.  And the pleading alleges that the contract is

14   continuing in effect.  And for purposes of Rule 12, it's that

15   allegation that must be taken as true.

16        Your Honor, facts outside the pleadings that are not

17   judicially noticeable cannot be considered without converting

18   this to a Rule 56 motion for summary judgment, and the Court

19   should not do that because the preliminary injunction record

20   was not complete on this question.

21        The fact of the matter is, Your Honor, LinkedIn never

22   terminated the contract.  It never even terminated hiQ's member

23   status.  It only restricted hiQ's member status.

24        But in all events, as the Court noted in its preliminary

25   comments, this contract governs both members and visitors.  So

even if hiQ's status as a member had been terminated -- which

it was not and which is contrary to the allegations of the

counterclaim -- the agreement would still govern hiQ's actions

as a visitor by its express term.

In paragraphs 36 to 46 of the counterclaim, Your Honor,

LinkedIn alleges in detail all of the steps that were taken

by -- over time by hiQ that show its actual knowledge of and

assent to the terms of that contract, the one that makes a

distinction between members and visitors and imposes

obligations on visitors as well as members.  This was not only

by virtue of their scraping and continued access, which would

be sufficient under the *Nguyen* case, Your Honor, but also by

express agreement with a variety of other contractual

relationships they entered into with LinkedIn that expressly

relied upon and incorporated these terms of use.  So there was

clearly actual knowledge, Your Honor.

The allegation is that the contractual obligations are

continuing.  Termination is a question of fact.  This Court did

not previously purport to dispose of a contract claim that had

not even yet been pled, Your Honor, nor did the Ninth Circuit.

The Ninth Circuit clearly said that it's not expressing any

views on the merits of the state law claims in its opinion.

So, Your Honor, this claim should proceed.

**THE COURT:**  All right.  Thank you.

Let me address the misappropriation claim here.  It

1    appears to me that a question of whether there are property

2    rights is one that, you know, we look to California precedent

3    here.  And there is a fair argument, at least under the

4    *International News* case, that there is at least a

5    quasi-property interest, even in just the information-gathering

6    process here and even if it's public information, such as news.

7    And that suggests to me that there's enough there at least,

8    again, to get by on a 12(b)(6) motion.

9         And as far as preemption, CUTSA preemption, here, there's

10   no claim that the public information, the public profiles are

11   confidential or generally not known to the public.  So that's

12   hard to find in preemption here.

13        So that's my initial take, but, again, I'll let you

14   comment on that, Ms. Sharma.

15        **MS. SHARMA:**  Thank you, Your Honor.

16        Regarding the "hot-news" test, I would say that there

17   are -- it's a five-part test under the Second Circuit's *NBA*

18   precedent, which was applied by -- in the *Polestar* case that

19   LinkedIn itself cites.  We don't think that LinkedIn meets the

20   standard under the *NBA* test for two reasons.

21        One is that that standard requires that the defendant be

22   in direct competition with a product or service offered by the

23   plaintiff.  That's simply not what happened here.  HiQ is not,

24   as *Polestar* was, an entity that is copying and replicating

25   exactly what the plaintiff in that case did.  HiQ takes data

1   that is owned by LinkedIn's users, according to LinkedIn's own

2   user agreement.  It incorporates that data into its own product

3   and creates something new.  It is not in direct competition

4   with LinkedIn for these purposes.  So we don't think this

5   qualifies under that prong of the "hot-news" test.

6       **THE COURT:**  What about -- I mean, part of your theory is

7   that there is competition, at least in terms of the product,

8   the end product.  That's your theory.  That's your antitrust

9   theory.  That's your unfair practice theory.  Is that

10  consistent with arguing that they're not in direct competition?

11      **MS. SHARMA:**  I think it is, Your Honor, and the reason is

12  that there is competition with a derivative product of

13  LinkedIn's, the product that they've created to mimic what hiQ

14  did.

15      But what they're alleging that we are copying is the

16  underlying source data that both entities use to create that.

17  And LinkedIn has not cited any case where "hot news" is applied

18  because the competition between the parties is in a derivative

19  element, in a derivative product that is built upon that hot

20  news.  That's an extension of the "hot-news" doctrine that

21  hasn't been done, at least that we have seen in the case law.

22  And so we think that's the distinction here; that "hot news"

23  might be appropriate if we were simply copying and republishing

24  the data as a competitive professional networking site, but

25  that's not what LinkedIn -- that's not what hiQ does.

**THE COURT:**  So the direct competition is a requirement, even though, generally, it is not an essential element of the misappropriation claim pursuant to the *USGA* case.  You're saying because it's a "hot news" subset of misappropriation, that direct competition is required?

**MS. SHARMA:**  Yes, Your Honor.  And that comes from the *Polestar* case that LinkedIn cites.  That's a California case applying common law misappropriation under California law.  And it applies the *NBA* standard from the Second Circuit to determine whether or not this applies.

**THE COURT:**  Okay.  Why else?

**MS. SHARMA:**  The second element of the test that we don't think is met is that LinkedIn would need to show that the ability of hiQ to, quote/unquote, free ride on LinkedIn's efforts would so reduce the incentive to produce LinkedIn's product, that the existence or quality of that product would be substantially threatened.

And we don't see an allegation in the complaint that LinkedIn says its incentive to produce its product is being threatened.  It makes allegations about the costs of limiting automated scraping access, but not to the extent needed, we think, to establish a "hot-news" exception.

**THE COURT:**  Okay.  Go on.

**MS. SHARMA:**  Those are the two bases under the "hot-news" test, Your Honor.

1     **THE COURT:**  All right.  And what's your response,

2  Ms. Hurst?

3     **MS. HURST:**  Your Honor, the *Polestar* case does not discuss

4  or acknowledge the *USGA* case.  It doesn't purport to reinject

5  an element of direct competition to the California

6  misappropriation court, which *USGA* clearly says is not present.

7  Your Honor, it's simply not an element of the common law

8  misappropriation tort.

9     However, I do have to say, Your Honor, if hiQ is saying

10  that there is no competition between the parties, then the

11  injunction should be dissolved, because the basis for that

12  injunction was an unfair competition claim.

13     **THE COURT:**  All right.  And what about the free ride

14  issue?

15     **MS. HURST:**  Your Honor, clearly, the free riding

16  requisites have been alleged here.  LinkedIn has alleged

17  substantial time, effort, and investment.  It has alleged the

18  acquisition of the quasi-property interest through the

19  development of the aggregation of data.  It fosters that

20  aggregation of data in the same way that International News

21  did.

22     And, Your Honor, in fact, with respect to the free riding,

23  it is on the timing of the changes, for example, in the Keeper

24  product, where hiQ is exploiting the timeliness of changes in

25  data.  All of these elements are met, Your Honor.

1    **THE COURT:**  But what about the argument that it's got to

2    be such a disincentive that it -- I don't know the exact

3    words but -- impacts on LinkedIn's business in a way that -- I

4    don't know if you use the word "material" or "substantial," but

5    something along those lines?

6    **MS. HURST:**  Your Honor, that's the Second Circuit test

7    that they're citing which simply has not been incorporated

8    anywhere into California law.

9    The elements under California law do not require that sort

10   of, you know, disincentive as part of the tort, as expressed in

11   the *USGA* case.  Your Honor, it simply requires the plaintiff to

12   establish injury, and there is both actual and threatened

13   injury here from the conduct of hiQ and those of its ilk.

14   **MS. SHARMA:**  Your Honor, may I respond to that briefly?

15   **THE COURT:**  Yeah, briefly, mm-hmm.

16   **MS. SHARMA:**  Just to pick back up on the competition

17   element, hiQ is obviously not backing away from its allegations

18   regarding the basis for LinkedIn's conduct, which we do think

19   is because they were attempting to compete with the derivative

20   product that hiQ created.

21   All I simply want to point out with respect to the *NBA*

22   test is that it's a very limited exception.  The "hot-news"

23   test is meant to only pick up and extend protection to a very

24   particular subset of publicly available data that should be

25   accorded protection.

1      And one of the ways to limit the scope of that protection

2   that the Second Circuit has held and that *Polestar* applied in

3   California is that there does need to be competition with the

4   product that is being allegedly misappropriated.  And there, in

5   *Polestar* and in the *NBA*, it was a product that was being

6   wholesale copied and replicated, exactly the same form and

7   method that it was being produced by the plaintiff.  In

8   *Polestar*, it was concert listings that were being picked up,

9   copied, and republished on a website.  That's the distinction

10  we're trying to draw; that that is not what is happening when

11  hiQ accesses the data of LinkedIn.

12      **THE COURT:**  Well, that essentially, as I think I said at

13  the outset, that this is a sort of "hot news" enclave of

14  misappropriation law.

15      **MS. SHARMA:**  Yes, that's correct, Your Honor.  Thank you.

16      **THE COURT:**  Let me ask about trespass.

17      The kind of injury that is typically required in these

18  kinds of cases is some burdening of the infrastructure servers

19  in a way that really burdens performance.  So it's not just the

20  expense of anticipating the need for defensive mechanisms, it

21  seems to me, but whether there's actually some loss of

22  performance here.

23      And are there allegations specific -- what are the

24  specific allegations here that would fit into that kind of

25  arena?

1    **MS. HURST:**  Your Honor, that's really not the test under

2    *Thrifty-Tel* and *Intel v. Hamidi*, if I may address that point

3    first.

4         **THE COURT:**  Yes.

5         **MS. HURST:**  Your Honor, in *Thrifty-Tel*, there were two

6    different allegations of hacking.  The first involved using a

7    long-distance phone system for an instance of 23 and

8    16 minutes.  So all they did was make some long-distance calls,

9    Your Honor.  The second episode of hacking involved

10   overburdening the system.

11        Ultimately, the Court in that case held that the second

12   episode of hacking would not give rise to relief because the

13   plaintiff had failed to mitigate.  And so the case went to

14   judgment solely on 40 minutes of long-distance telephone calls

15   without any evidence of interference in the system.  That's

16   *Thrifty-Tel*, Your Honor.

17        **THE COURT:**  But that's using -- I mean, it feels different

18   because that's, like -- I know there's a question of whether

19   you're actually using and interfacing with a server or not.

20   But it seems to me that that is a pretty deep intrusion.

21        **MS. HURST:**  Well, Your Honor, not really.  In that case,

22   all they did was spoof a six-digit code in order to hook up to

23   the system and then place a long-distance phone call.  So, you

24   know --

25        **THE COURT:**  But it went into Thrifty-Tel's computerized

1    switching system.  It wasn't a -- it seemed to me it was a

2    deeper intrusion into Thrifty-Tel's computerized switching

3    system than what we're talking about here.

4        **MS. HURST:**  Well, Your Honor, I mean, if you look at the

5    facts of the cases discussed, in *Intel v. Hamidi*, we've got

6    CompuServe, where it was a spammer, but the individual spammer

7    was not overburdening the system; we've got *eBay*, where it was

8    a scraper, but the individual scraper was not overburdening the

9    system; we've got *Register.com*, where it was a scraper, but the

10   individual scraper was not overburdening the system.

11       And in that -- in all of those cases, courts held,

12   including this Court in the *Bidder's Edge case*, that the

13   automated data collection could have, especially if replicated

14   by other searchers, had deleterious impact on the equipment.

15       Now, Your Honor, the reason that the *Ticketmaster* case

16   went the other way was because the Court in that case held

17   there wasn't -- there weren't likely to be any follow-on.

18   There weren't likely to be any other scrapers because that was

19   such a limited market.  And so in *Ticketmaster*, the plaintiff

20   was unable to show that threatened harm from replication.

21       So the ultimate holding in *Hamidi*, Your Honor, at 1356, is

22   Hamidi is unable to show appreciable effect on the operation of

23   its computer system, nor any likelihood that Hamidi's actions

24   will be replicated by others if found not to constitute a

25   trespass.

1        So, Your Honor, in these computer trespass situations,

2    it's quite clear that it is sufficient to allege that this is

3    the kind of activity that has been and will be replicated by

4    others and that the total -- the total sum of that kind of

5    activity is deleterious on the system.

6        And, Your Honor, it is deleterious because LinkedIn and

7    others like it have to invest quite a lot in capital and

8    operating expenses in order to parry this kind of activity and

9    to stay on top of it.

10       And the standard is not that you have to anticipate the

11   arms race and buy nuclear weapons for the end point in order to

12   stop it from happening.  That's not the standard for injury

13   here, Your Honor.  It can be actual or threatened injury.  And

14   there is clearly threatened injury from replication.

15       But, Your Honor, I will say this as well.  We know that

16   hiQ is scraping, and we know that that's placing some burden on

17   LinkedIn's platform.  What we don't know is the quantum of that

18   because we haven't had discovery yet.

19       And, Your Honor, if we have discovery and we find out how

20   much scraping they've done, then we will be able to quantify

21   the marginal effect of that on LinkedIn's system and the

22   portion of LinkedIn's investment that is attributable to hiQ's

23   activities.

24       So, Your Honor, we think it's sufficient to allege the

25   threatened injury from replication.  It's clearly part of the

holding in *Intel v. Hamidi*; the *CompuServe* and *eBay*,

*Bidder's Edge* and *Register.com* cases.

Your Honor, but even without that, there's an allegation

of scraping from hiQ and increased marginal costs that LinkedIn

has incurred as a result of scraping; and the fact that we

can't quantify that, Your Honor, at this early point under

Rules 8 and 12 is not a reason to dismiss the claim.

**THE COURT:**  Is there an allegation, a specific allegation

that the infrastructure is -- the servers are slowed down, that

there actually is a difference in performance because of these

scraping operations?

**MS. HURST:**  Your Honor, there's an allegation that

LinkedIn has had to put on additional equipment, additional

bandwidth; that it's hired an entire team of people; that it

has developed multiple different types of software and

specialized technical tools.

And, Your Honor, the allegation is the current volume --

and this is in paragraph 83 -- the current volume of bot

requests could easily impair the ability of many websites that

do not invest as much in their infrastructure as LinkedIn does.

Your Honor, the trespass tort is not only available to big

companies who can afford to invest.  Trespass is not a claim

that's only available to someone who owns a mansion trying to

prevent trespassers, and not to someone who owns a small

apartment or a small cottage or bungalow.

1    **THE COURT:**  Well --

2        **MS. HURST:**  It's available to everyone, Your Honor.

3        **THE COURT:**  Well, actually, your argument kind of goes the

4    other way; that it's the small operations that don't have the

5    ability to counter the nuclear race with anti-bot stuff that

6    gets easily impaired and clogged up.  So there, it'd be easier

7    to prove.  Right?  You don't need a whole lot of activity to

8    result in either denial of services or a slowdown of services.

9        My question is:  Is there something here -- is this --

10   what happens?  I guess I don't know enough about this process.

11   But when there is what you call a scraper, how does that

12   actually impact the infrastructure?

13       **MS. HURST:**  Well, Your Honor, what the scraper or the bot

14   does is it presents a lot of requests in a very short period of

15   time, and those requests then have to be fulfilled by the

16   servers.  And the fulfillment of those requests does place a

17   burden on the servers in order to satisfy -- either to satisfy

18   the request or make an assessment that it's not a request that

19   should be satisfied, because it's an unauthorized request for

20   access, and it should be turned away.

21       So, Your Honor, the only way that LinkedIn avoids that

22   impairing the operation of its website on an ongoing basis is

23   by making huge marginal investments.

24       **THE COURT:**  All right.  So --

25       **MS. HURST:**  And, Your Honor --

1   **THE COURT:**  -- it is in the form of access requests, a

2   huge number of access requests that presents the threat?

3   **MS. HURST:**  That's correct, Your Honor.

4   **THE COURT:**  And then you have to block those in order to

5   preserve the resources?

6   **MS. HURST:**  Correct.

7   **THE COURT:**  All right.  So let me ask you, Ms. Sharma.

8   Why isn't that enough, again, at least for 12(b)(6) purposes?

9   **MS. SHARMA:**  First, Your Honor, I'd point to the fact that

10  nothing in the complaint actually says that it is the attacks

11  on LinkedIn that is causing the impairment of the property;

12  here, the servers.  There's no allegation in the complaint that

13  it's the attacks on the servers that slow the servers down.

14  What the allegation in the complaint is, is that LinkedIn

15  is preventing tremendous -- is expending a tremendous amount of

16  resources blocking that access; and therefore, they've sort of

17  manufactured their own harm.  I think there's two problems with

18  that.

19  **THE COURT:**  Well, but isn't that obvious, that if they

20  don't block it -- isn't that what a bot does, is it creates and

21  manufactures access requests?  Is that in doubt?

22  **MS. SHARMA:**  No, Your Honor.

23  But I think if you look at the *Hamidi* case, it explains

24  why LinkedIn's claim is insufficient.  In *Hamidi*, a former

25  employee used Intel's servers to send messages to Intel's

employees.  So there was some intrusion on the server.  There

was some use of the server's capacity.  And the Court in *Hamidi*

found that that was insufficient because the server was being

used in the exact method that it was intended to be used -- it

was being used to funnel e-mail traffic -- and that,

thereafter, that wasn't a harm.

So Intel fell back and said, okay, the harm that they

claimed was consequential economic damages; i.e., the loss of

productivity of their employees and company efforts to block

messages.

That's exactly what LinkedIn is saying here, is that the

harm isn't the harm; the harm is what we're doing to prevent

the harm.

**THE COURT:**  Well, but there's -- yeah, is it individual?

Mr. Hamidi was doing something on an individual basis.  Here,

the claim is that this is in a much larger context; that not

only that, it's capable of replication by others because -- it

seems to me that's exactly the difference.

It's not just an individual trying to get at certain data

and use certain data addresses to e-mail perhaps unsolicited

letters or e-mails and this sort of thing.  This is on a mass

basis.  That's the allegation here.  And the scraping is on a

systemic basis.  So it seems to me that's the difference.

**MS. SHARMA:**  That's fair, Your Honor, but that's not the

distinction that *Intel* drew.  What *Intel* said was that

1  consequential damage simply isn't an injury; that if access

2  itself had overburdened the system and, quote, made the entire

3  system harder to use, that might be a harm; but a consequential

4  damage -- and the *Intel* case didn't speak about the scope of

5  that damage -- can't constitute a harm because it effectively

6  allows the defendants to sort of manufacture their own damage.

7          In terms of the question of aggregating follow-on harm

8  entirely with regard to *eBay*, what *Hamidi* says about that is,

9  they summarize the standard of the *eBay* case as being

10 (reading):

11          ". . . defendant's use of the plaintiff's

12          computer . . . was held sufficient to support an

13          action for trespass when it actually did, or

14          threatened to, interfere with the intended

15          functioning of the system . . . ."

16 And that's from page 1356.

17          We think here there's simply no allegation in the

18 complaint that what hiQ did impacted the system.

19          And I'll just add one more thing.  Ms. Hurst said that

20 LinkedIn can't articulate or quantify the quantity of harm that

21 they're suffering from hiQ because they haven't yet obtained

22 discovery.

23          They have said in their motion to dismiss -- and,

24 you know, we have correspondence between the parties about

25 this -- that there is a whitelist that LinkedIn has maintained

since the PI, and that whitelist has a list of all IP addresses used by hiQ.

So to the extent that LinkedIn needs to quantify the level of scraping, it has a list of the IP addresses that have been used.  It can simply pull them.  There's nothing preventing that.  And there's no allegation in the complaint that LinkedIn has done that sort of basic work.

**THE COURT:**  All right.  I'll give you the last word, since it's your motion, Ms. Hurst.

**MS. HURST:**  Yeah.  Your Honor, we certainly weren't operating under a whitelist prior to the time of the injunction.  So all of the activity that hiQ engaged in at that time, which is part of this claim, is unknown in its exact contours.

But, Your Honor, *Intel v. Hamidi* is clear that it's the threatened injury from replication that is sufficient to state this claim.

And, Your Honor, this consequential damages analysis Ms. Sharma is proposing is not the analysis of *Hamidi* with respect to burdening on the system.  It's the analysis of *Hamidi* with respect to the content of the e-mails there.

The Court will recall that the content of the e-mails was highly disruptive.  It's critical of Intel's human resources function and its policies.

And it was with respect to the content of the e-mails that

1    the Court said:  We're not going to let that disruption, that

2    consequential disruption and the efforts to stop it from

3    happening, become part of the claim.

4         And that was for obvious reasons there because, you know,

5    the communicative aspects of the e-mails were what were at

6    issue in that part of the analysis.

7         That's not the case here, Your Honor.  We're talking

8    about, as alleged in paragraph 83, automated scrapers taken in

9    the aggregate, placing a substantial burden on LinkedIn's

10   infrastructure reaching, at present, into hundreds of millions

11   of blocked access requests per day.  That is a cognizable

12   trespass claim, Your Honor.

13        **THE COURT:**  All right.  I will take the matter under

14   submission.  As I indicated, my intent is to rule on those

15   state claims that we talked about.

16        But the question of the CFAA and the 502, I'm probably

17   going to not issue any decision yet and will await word from

18   the Supreme Court.

19        But to move things along, I will rule on these three.

20        So let's talk for a moment about -- do we have any case

21   management issues that we need to talk about?

22        **MS. SHARMA:**  Not from the perspective of plaintiffs,

23   Your Honor.

24        **THE COURT:**  All right.

25        **MS. HURST:**  No, Your Honor.  Thank you.

1    **THE COURT:**  All right.  Well, in light of the stipulated

2  stay, I guess we'll just have to wait and see.  We'll have more

3  to talk about when the Supreme Court acts.

4          Thank you.  I'll take the matter under submission.

5    **MS. SHARMA:**  Thank you, Your Honor.

6    **MS. HURST:**  Thank you, Your Honor.

7              (Proceedings adjourned at 2:45 p.m.)

8                        ---o0o---

9

10              **CERTIFICATE OF REPORTER**

11          I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:  Monday, July 26, 2021

15

16  _Ana Dub_
   _____

17      Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
              Official United States Reporter

18

19

20

21

22

23

24

25