**Pages 1 - 16**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| 3TAPS, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) |
| VS. | ) **NO. C 18-00855 EMC** ) |
| LINKEDIN CORPORATION, a Delaware corporation, | ) ) ) |
| Defendant. | ) ) |

San Francisco, California
Thursday, April 7, 2022

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:
        THE LAW OFFICES OF THOMAS V. CHRISTOPHER
        415 Mission Street, 37th Floor
        San Francisco, California 94105
  BY:  **THOMAS V. CHRISTOPHER, ATTORNEY AT LAW**

For Defendant:
        ORRICK, HERRINGTON & SUTCLIFFE LLP
        The Orrick Building
        405 Howard Street
        San Francisco, California 94105
  BY:  **ANNETTE L. HURST, ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official U.S. Reporter

|   |   |   |
|---|---|---|
| 1 | **Thursday - April 7, 2022** | **2:08 p.m.** |

**P R O C E E D I N G S**

---o0o---

**THE CLERK:** The court is now calling 3Taps, Inc. vs. LinkedIn Corporation, Case Number 18-855.

Counsel, please state your appearance for the record, beginning with the plaintiff.

**MR. CHRISTOPHER:** Good afternoon, Your Honor. Thomas Christopher for the plaintiff, 3Taps, Inc.

**THE COURT:** All right. Thank you, Mr. Christopher.

**MS. HURST:** Good afternoon, Your Honor. Annette Hurst for LinkedIn.

**THE COURT:** All right. Thank you, Ms. Hurst.

To have standing, there has to be a sufficient degree of immediacy and, sort of, concreteness or reality. And at least if we borrow from the patent context and the Supreme Court's decision in *MedImmune*, the Court looked to whether there's been some affirmative act by the threatened -- the party that's threatening potential action and whether there's been meaningful preparation to conduct the allegedly unlawful or infringing activity.

And I can see there's an argument here. Although LinkedIn has not threatened a lawsuit, it has written a letter making it clear what its position is, and it has been engaged in counterclaims and active litigation in the other matter. So

1  I'm not as concerned about that.
2      I think the problem here for 3Taps is the complaint is
3  pretty generic and conclusory when it comes to what is it doing
4  to meaningfully prepare to do this data scrape.  After reading
5  the complaint, I'm still not sure exactly what it does and how
6  it does it and how close is it to doing it.  I mean, I
7  understand it states:  We're ready, willing, eager, able.  But
8  that doesn't say much.
9      **MR. CHRISTOPHER:**  Thank you, Your Honor.
10     The way data scraping works, it's a highly fluid-type
11 situation, almost like a war or a battle.  There isn't some
12 50-page "This is the exact process we're going to follow"
13 beforehand.  They kind of get in there, see what you're
14 getting, and see how useful it is.
15     We are professional data scrapers.  It's all we do.  And
16 we would like to scrape LinkedIn.  We think the law allows us
17 to do that.  We think that's supported by Your Honor's
18 decision, because we've been sued for this in the past with
19 litigation with Craigslist.
20     Because we have been sued -- they say once bitten; twice
21 shy -- we let LinkedIn know in advance what we were going to
22 do.  Now, at that point in time, they didn't have to do
23 anything at all; but they made a decision to write us back a
24 letter that was very threatening, we felt.  And --
25     **THE COURT:**  Yeah.  No.  I understand that.  That goes to

1  the affirmative act thing, and you have a pretty decent
2  argument on that, even though there's been no threat of suit
3  per se.
4       But I'm still -- unlike *hiQ*, where it was clear what the
5  plan -- they had a plan; they had a business plan.  What is --
6  how do I know this is a real part of the business that
7  something -- what's going to be used with this data?  What's
8  the plan?
9       **MR. CHRISTOPHER:**  I would love to address that,
10 Your Honor.  First of all, I'll go to the "How do you know?"
11 And it goes to the concept of, this is all we do.  We're data
12 scrapers and nothing else.  So if Ford Motor Company says
13 "We're going to build pickup trucks next year," that's
14 believable.  That's all they do.
15      Now, in terms of the plan, there is a plan, but we do not
16 want to put it in the pleading, and there's a very good reason
17 for that.  You have to remember that LinkedIn is a direct
18 competitor of 3Taps for the monetization of the information on
19 3Taps -- on LinkedIn.  They want to monetize the data on
20 LinkedIn, and we want to monetize the data too.  And we have a
21 plan to do that but --
22      **THE COURT:**  You don't have to give away exact details, but
23 something.  I still don't have any idea what it is and how
24 close you've come to actually commercializing whatever you're
25 planning to do.  I mean --

1    **MR. CHRISTOPHER:**  Well, we know -- I'll tell you this.
2    And just to finish my point, we're okay -- we think that
3    kind of information belongs in an attorneys'-eyes-only
4    protective order where LinkedIn can't see it.  We are more than
5    happy, if they want to serve discovery, to get at this.  We'll
6    do a two-tier protective order, and we'll let Ms. Hurst see it.
7    We'll let the Orrick firm see it.
8    But LinkedIn can't know our business plans and they can't
9    know who our prospective customers are.  They are much bigger
10   than us.  They are much better resourced.  And they are a
11   competitor for those opportunities, and they can get there and
12   take them away from us.  And we've said, sort of, what we think
13   is as much as we can possibly say without hinting to the
14   LinkedIn people what exactly the business plan is, because we
15   don't want them to know the business plan.
16   We'll tell Orrick.  Orrick can know.  Your Honor can know
17   *in camera*.  But we don't want LinkedIn to know, and that's why
18   we don't want to put it in a pleading.  They could destroy our
19   business.
20   **THE COURT:**  Have you described -- and let me pull up the
21   complaint -- what other things -- you say, "This is all we do."
22   Is there a description of some of these other things your
23   company, your client does?
24   **MR. CHRISTOPHER:**  Well, no.  We scrape data, and we find
25   ways to monetize it.

1    **THE COURT:**  Well, I know.  But I mean, can you give some
2    examples so I know -- one knows this is --
3    **MR. CHRISTOPHER:**  Well, I can --
4    **THE COURT:**  -- reality and not -- this is really a
5    business and not just --
6    **MR. CHRISTOPHER:**  Oh, absolutely, Your Honor.  We have
7    proof of that.  And that is, we have been -- we're one of the
8    most well-known data scrapers in the world; and we've been
9    involved in very, very high-profile litigation over our
10   scraping.  And that's the *Craigslist* case that went on
11   for years in front of Judge Breyer.
12         Craigslist sued us for scraping them.  They didn't do that
13   because we were imaginary and don't scrape people and just talk
14   about scraping people but don't do it.  The reason Craigslist
15   sued us and dragged us through all that litigation is we're
16   real live data scrapers.  We scraped Craigslist.  We absolutely
17   did.
18         And that's why there's all this publicly available
19   information out there about us and the case law that
20   Judge Breyer wrote and other things about our data scraping.
21   So we are a real business.  We're probably the best-known data
22   scraper in the world.
23   **THE COURT:**  All right. Ms. Hurst, could you respond to
24   that?
25   **MS. HURST:**  Yes, Your Honor.  Thank you.

1  Your Honor, first, I'd just like to point out that the
2  circumstances in *MedImmune* were very, very different from the
3  circumstances here.  In that case, as the Court noted, there
4  was a product already on the market.  And it was 80 percent of
5  the company's revenues that were implicated by the dispute over
6  the validity of the Cabilly II patent in that case, Your Honor.
7  And that is just -- in that context, to have a dispute over
8  whether the patent was valid and whether the license had to be
9  complied with is very, very different than what we've -- what
10 we have here.
11      **THE COURT:**  All right.  So that's a simple case.  That
12 doesn't mean that's the only case.
13      **MS. HURST:**  No, Your Honor.  And I do want to point out a
14 couple of other cases, Your Honor.
15      On the question that the Court was just asking
16 Mr. Christopher about the concreteness of the plans,
17 Your Honor, the *Merit Health Care* case from the
18 Ninth Circuit -- which is not precedential because it's
19 unpublished, but it is very instructive in its description of
20 the facts.  Your Honor, that case says -- it's a trademark
21 case, Your Honor.
22      The complaint identifies various trademarks and trademark
23 applications used on various products, but does not identify
24 which marks are used on which products sold to which customers
25 through which trade channels and in which geographical trade

1  areas.
2      The complaint makes no mention of any customers, trade
3  channels, geographical trade areas of overlapping use.  And to
4  the extent there is any similarity of marks, the parties have
5  coexisted for 30 years without conflict.
6      Your Honor, the Court goes on to point out that a rights
7  holder has no obligation to spend the time and money to test a
8  competitor's product or to make a definitive determination, at
9  the time and place of a competitor's choosing, that it will
10 never bring suit.
11     In other words, LinkedIn, Your Honor, is not required,
12 when it has hundreds and hundreds of scrapers, to pursue each
13 and every one of them.  And it had no plans whatsoever, as it
14 made clear in its correspondence, Your Honor, to pursue 3Taps
15 at the time 3Taps initiated this discussion.
16     And, Your Honor, in the *Millennium Laboratories* case,
17 the Court pointed out that a back-and-forth of attorney
18 correspondence suggests there may be a difference of opinion,
19 but this is not a significant factor demonstrating immediacy.
20     And so what's lacking from the correspondence, Your Honor,
21 is the type of coercive threat that *MedImmune* identified.
22 Your Honor, the Court, throughout the *MedImmune* opinion, uses
23 that coercive threat of enforcement language to justify
24 declaratory relief standing in a private civil case.  You know,
25 the Court looks at what is it, in a case where there's

1  potentially criminal enforcement by the Government, that you
2  can find in a civil action to justify finding a dispute; and
3  the Court repeatedly uses the words "coercive threats."  And
4  that just wasn't present here, Your Honor.
5      So what don't we see in this complaint?  And I think
6  the Court's last question to Mr. Christopher was a really good
7  one.  What is the company's annual revenues in its scraping
8  business?  What type of monetization is it already engaged in?
9  How is it conducting its business in a way that certainly must
10 be at least somewhat publicly available information?  All of
11 these facts to indicate that there's a real business here
12 rather than -- rather than just a lawsuit.
13     And what was really telling about Mr. Christopher's
14 response is that he didn't point to any kind of business.  He
15 pointed, again, to another lawsuit.
16     Now, Your Honor, this case has been pending for more than
17 four years.  And the standing requirement requires harm.
18 Requires harm.  In that four years, 3Taps has not embarked on
19 whatever it claims it wants to do here.
20     And, Your Honor, not only has it not done that in the last
21 four years, but in the CMC statement, 3Taps proposes to
22 continue an indefinite stay on any resolution of this motion to
23 dismiss and on this case, which means it doesn't intend to
24 commence doing whatever it was that it wouldn't disclose,
25 you know, in its complaint any time soon.

1    Your Honor, that level of delay completely undercuts any
2    notion of meaningful harm that's required for injury, that is
3    required for redressability.
4        Your Honor, I'd also like to separately address the
5    redressability point, but I think I've gone probably beyond
6    your question at this point so I'll stop.
7        **THE COURT:**  All right.  I'll let you respond,
8    Mr. Christopher, to that.
9        **MR. CHRISTOPHER:**  Yeah, I'd like to respond to all of
10   that.
11       You know, Ms. Hurst referred to a case in which customers
12   were not identified, and the Court faulted the plaintiff for
13   that.  But remember, this is a litigation among direct
14   competitors for the monetization of the data on LinkedIn.
15   We're not going to put it in a pleading.  We're not going to
16   tell them who our customers are, our potential customers are.
17       They can get to the data faster.  They're bigger, better
18   resourced, and they can undercut us.  They take those
19   opportunities away from us.
20       We can put that in an attorneys'-eyes-only protective
21   order.
22       **THE COURT:**  Why not file a portion of the complaint, a
23   redacted complaint that's publicly redacted, but the unredacted
24   version that has some specificity, seek to file it under seal,
25   for attorneys' eyes only, so that the attorney, Ms. Hurst and

1 her firm, can look at it and respond on behalf of LinkedIn and
2 yet not necessarily share that with decision-makers in terms of
3 the business plan?  How about that?
4     **MR. CHRISTOPHER:**  No problem.
5     **THE COURT:**  Well, maybe that's a simple solution, because
6 that way, three of us can argue, then, at that point.  May have
7 to do it under seal if I think it's worthy of under seal.  But
8 at least then I can assess immediacy and concreteness and
9 meaningful preparation.  Because right now, I can't assess it,
10 and you're sort of telling me:  Well, I can't share it with you
11 because I --
12     **MR. CHRISTOPHER:**  Well, I can share it with you,
13 Your Honor.  I just can't --
14     **THE COURT:**  All right.  Yeah, but this is not -- I don't
15 like to do ex parte things.  But there's a way of doing it, as
16 often happens in patent cases and such.
17     Any reaction to that, Ms. Hurst?  What about if I dismiss
18 with leave to amend, and Mr. Christopher can then resort to --
19 if he really needs to, in order to get the level of specificity
20 that he contemplates that the Court is looking for, can file
21 that portion under seal for your eyes, attorneys' eyes only, at
22 least to get through this stage and see if there's enough
23 there?
24     **MS. HURST:**  Your Honor, I'm deeply skeptical.  And,
25 you know, obviously, we would prefer that this be dismissed

fully and finally. If the Court thinks that Mr. Christopher has articulated enough to meet the standard, you know, or it wants to further evaluate that, I can understand why the Court might do so.

Let me make a -- let me make a plea here to the Court on discretionary grounds. Your Honor, this is --

**THE COURT:** Yes.

**MS. HURST:** -- an entirely declaratory relief claim.

The Court has discretion whether to entertain it or not. And, Your Honor, this is a bad type of case to exercise categorical discretion in this kind of a situation because, basically, what you have here is two private civil litigants where one of them is trying to seek judicial preclearance of a business model.

This is not, I would submit, Your Honor, a good use of the Court's resources. The Declaratory Judgment Act is supposed to be used sparingly. And for businesses to say "Okay; well, we might have a dispute if we do this, and I'm going to run to court first every time" is just not a good use of either the Court's or the litigants' resources.

Your Honor, I'm also frankly concerned here because there's a bit of a pattern of playing fast and loose with the facts. And, you know, this whole circumstance where 3Taps alleged that this case arose from the *hiQ* case, when that business relationship was entirely manufactured in response to

1  the Court's injunction, is deeply concerning, Your Honor.
2       And, you know, 3Taps went out and bought a piece of hiQ
3  after the Court issued its injunction, and then sent this
4  letter, provoking LinkedIn to assert its legal position.
5       And the one thing, Your Honor, that the Court -- that
6  3Taps has never said is that it would seek relief regarding the
7  user agreement.  And so there's clearly all of these claims
8  that could be brought.  And the breach of the user agreement
9  claim is an important one that would be central to the type of
10 dispute that Mr. Christopher claims to be litigating here on
11 behalf of 3Taps; and yet, not in any of the prior complaints
12 that they've filed have they sought a declaration regarding the
13 user agreement.
14      And that really goes to this point of redressability,
15 Your Honor.  They're not seeking complete relief.  Why on earth
16 would 3Taps go to the lengths of filing two complaints and not
17 seek to redress the one claim that is the most obvious claim,
18 the clearest claim, and the one that would be central to all of
19 the other statutory and tort allegations?
20      And, Your Honor, the reason for that is clear if we look
21 at the prayer.  The prayer seeks a very broad advisory opinion
22 that scraping is okay under a federal statute and state statute
23 in a common law tort theory.  And that's the agenda here.
24      And what they are trying to do is create a safe harbor for
25 an existing permanent injunction.  And, Your Honor, I would

1  just respectfully submit that that's not a good use of
2  this Court's discretionary resources.  They're not seeking to
3  redress all of the potential disputes here, none of which, by
4  the way, LinkedIn has indicated any intention of bringing
5  against 3Taps.  And instead, what they're doing is seeking a
6  safe harbor from an existing permanent injunction.
7      **THE COURT:**  All right.  Well, let me ask, Mr. Christopher.
8  What we're hearing is that, even if you were to prevail on a
9  declaratory relief claim for no violation of the CFAA, no
10 trespass, et cetera, but you've got the user agreement cause of
11 action -- potential cause of action, which could end up putting
12 your client in the same space and not really advance their
13 position, why should this Court exercise declaratory relief on
14 a partial -- partial judgment that it may have no effect at the
15 end, no real-world effect?
16     **MR. CHRISTOPHER:**  Two things, Your Honor.
17     Number one, scrapers fear the CFAA; they don't fear breach
18 of contract claims.  These are materially different causes of
19 action with materially different damage remedies and
20 consequences.  The CFAA and the other things we're talking
21 about have catastrophic business-destroying damage
22 calculations.  That -- you cannot compare that to a breach of
23 contract claim under which, arguably, LinkedIn has absolutely
24 no damages.
25     If it is that important -- I'm amending anyway; Your Honor

1  has said we can do an amended complaint -- we'll put that in
2  there too.  No problem.  This is all easily fixed and could
3  have been easily fixed.
4      **THE COURT:**  All right.  I'm going to grant the motion to
5  dismiss for lack of specificity, particularly on the meaningful
6  preparation prong of standing, but I'm going to give leave to
7  amend within 30 days.  And I will allow in advance, I'll give
8  permission in advance to the plaintiff to file some portion of
9  that under seal for attorneys' eyes only, but with the right of
10 defense counsel to see it, but not to share with the client yet
11 until further order so that the counsel can respond with
12 respect to whatever motion they're going to bring.  And so
13 we'll see what that looks like.
14     I think you know what the issues are at this point, what
15 you're going to be facing, Mr. Christopher.  There's both the
16 redressability question as well as a standing question here.
17 So I guess we will meet again, is my guess.
18     **MR. CHRISTOPHER:**  Yes, Your Honor.
19     One quick request, Your Honor.  May I have 40 days instead
20 of 30?  We have --
21     **THE COURT:**  Sure.
22     **MR. CHRISTOPHER:**  I have a client traveling and kids
23 headed to spring break here shortly.
24     **THE COURT:**  Yes, that's fine.  40 days.  You got it.
25     **MR. CHRISTOPHER:**  Thank you, Your Honor.

1     **MS. HURST:**  Thank you, Your Honor.
2     **THE COURT:**  All right.  Thank you, Counsel.  Thank you.
3     **MS. HURST:**  Thank you.
4           (Proceedings adjourned at 2:29 p.m.)
5                    ---o0o---

7                    **CERTIFICATE OF REPORTER**
8        I certify that the foregoing is a correct transcript
9   from the record of proceedings in the above-entitled matter.

11  DATE:  Wednesday, July 20, 2022

    *[signature: Ana Dub]*

15       Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                    Official United States Reporter