ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for Defendant*
*LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| 3taps, Inc.,<br><br>    Plaintiff,<br><br>    vs.<br><br>LinkedIn Corporation,<br><br>    Defendant. | Case No. 18-cv-00855-EMC<br><br>**JUSTICE DECLARATION IN SUPPORT OF OCTOBER 14, 2022 FILINGS**<br><br>Judge:        Hon. Edward M. Chen<br>Hearing Date:  October 27, 2022<br>Hearing Time:  1:30 p.m.<br>Ctrm:        Courtroom 5<br>Trial Date:    None Set |

I, Daniel Justice, declare as follows:

1.      I am an attorney admitted to practice in the State of California and the United States District Court for the Northern District of California, and am counsel of record for LinkedIn Corporation.  I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently thereto.  I submit this declaration in support of LinkedIn's Reply ISO LinkedIn's Motion to Dismiss Plaintiff's Second Amended Complaint and LinkedIn's Motion to Unseal the Second Amended Complaint.

2.      Attached hereto as **Exhibit 21** is a true and correct copy of the transcript of the April 7, 2022 hearing on LinkedIn's Motion to Dismiss 3taps's First Amended Complaint.

3.      Attached hereto as **Exhibit 22** is a true and correct copy of meet and confer correspondence between LinkedIn counsel and 3taps counsel spanning September 21, 2022 to October 13, 2022.

4.      Attached hereto as **Exhibit 23** is a true and correct PDF printout of Greg Kidd's LinkedIn profile, available at https://www.linkedin.com/in/gregkidd/.  I personally visited Mr. Kidd's LinkedIn profile on October 12, 2022 and downloaded the PDF version of his profile.

5.      Attached hereto as **Exhibit 24** is a printout of the ███████ webpage available at ████████████████.  I personally accessed this webpage on October 13, 2022 at 9:34AM and printed the contents of the webpage exactly as they appeared on that date and time.

6.      Attached hereto as **Exhibit 25** is a printout of the ███████ webpage available at ████████████████████.  I personally accessed this webpage on October 13, 2022 at 10:23AM and printed the contents of the webpage exactly as they appeared on that date and time.

7.      Attached hereto as **Exhibit 26** is a printout of the ███████ webpage available at ████████████████████.  I personally accessed this webpage on October 13, 2022 at 12:17PM and printed the contents of the webpage exactly as they appeared on that date and time

///

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2   true and correct.

3    Executed this fourteenth day of October, 2022, in San Francisco, CA.

4

5

6   _____

                                Daniel Justice

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 21

Pages 1 - 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

3TAPS, INC., a Delaware      )
corporation,                 )
                             )
          Plaintiff,         )
                             )
  VS.                        )   **NO. C 18-00855 EMC**
                             )
LINKEDIN CORPORATION, a      )
Delaware corporation,        )
                             )
          Defendant.         )
_____)

San Francisco, California
Thursday, April 7, 2022

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:
                    THE LAW OFFICES OF THOMAS V. CHRISTOPHER
                    415 Mission Street, 37th Floor
                    San Francisco, California 94105
              BY:   **THOMAS V. CHRISTOPHER, ATTORNEY AT LAW**


For Defendant:
                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California 94105
              BY:   **ANNETTE L. HURST, ATTORNEY AT LAW**




REPORTED REMOTELY BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Official U.S. Reporter

| | |
|---|---|
| 1 | **Thursday - April 7, 2022**          **2:08 p.m.** |

1    **Thursday - April 7, 2022**                     **2:08 p.m.**

2                    **P R O C E E D I N G S**

3                       ---o0o---

4       **THE CLERK:**  The court is now calling 3Taps, Inc. vs.

5   LinkedIn Corporation, Case Number 18-855.

6       Counsel, please state your appearance for the record,

7   beginning with the plaintiff.

8       **MR. CHRISTOPHER:**  Good afternoon, Your Honor.  Thomas

9   Christopher for the plaintiff, 3Taps, Inc.

10       **THE COURT:**  All right.  Thank you, Mr. Christopher.

11       **MS. HURST:**  Good afternoon, Your Honor.  Annette Hurst for

12   LinkedIn.

13       **THE COURT:**  All right.  Thank you, Ms. Hurst.

14       To have standing, there has to be a sufficient degree of

15   immediacy and, sort of, concreteness or reality.  And at least

16   if we borrow from the patent context and the Supreme Court's

17   decision in *MedImmune*, the Court looked to whether there's been

18   some affirmative act by the threatened -- the party that's

19   threatening potential action and whether there's been

20   meaningful preparation to conduct the allegedly unlawful or

21   infringing activity.

22       And I can see there's an argument here.  Although LinkedIn

23   has not threatened a lawsuit, it has written a letter making it

24   clear what its position is, and it has been engaged in

25   counterclaims and active litigation in the other matter.  So

1    I'm not as concerned about that.

2        I think the problem here for 3Taps is the complaint is

3    pretty generic and conclusory when it comes to what is it doing

4    to meaningfully prepare to do this data scrape.  After reading

5    the complaint, I'm still not sure exactly what it does and how

6    it does it and how close is it to doing it.  I mean, I

7    understand it states:  We're ready, willing, eager, able.  But

8    that doesn't say much.

9        **MR. CHRISTOPHER:**  Thank you, Your Honor.

10       The way data scraping works, it's a highly fluid-type

11   situation, almost like a war or a battle.  There isn't some

12   50-page "This is the exact process we're going to follow"

13   beforehand.  They kind of get in there, see what you're

14   getting, and see how useful it is.

15       We are professional data scrapers.  It's all we do.  And

16   we would like to scrape LinkedIn.  We think the law allows us

17   to do that.  We think that's supported by Your Honor's

18   decision, because we've been sued for this in the past with

19   litigation with Craigslist.

20       Because we have been sued -- they say once bitten; twice

21   shy -- we let LinkedIn know in advance what we were going to

22   do.  Now, at that point in time, they didn't have to do

23   anything at all; but they made a decision to write us back a

24   letter that was very threatening, we felt.  And --

25       **THE COURT:**  Yeah.  No.  I understand that.  That goes to

1   the affirmative act thing, and you have a pretty decent

2   argument on that, even though there's been no threat of suit

3   per se.

4        But I'm still -- unlike *hiQ*, where it was clear what the

5   plan -- they had a plan; they had a business plan.  What is --

6   how do I know this is a real part of the business that

7   something -- what's going to be used with this data?  What's

8   the plan?

9        **MR. CHRISTOPHER:**  I would love to address that,

10  Your Honor.  First of all, I'll go to the "How do you know?"

11  And it goes to the concept of, this is all we do.  We're data

12  scrapers and nothing else.  So if Ford Motor Company says

13  "We're going to build pickup trucks next year," that's

14  believable.  That's all they do.

15       Now, in terms of the plan, there is a plan, but we do not

16  want to put it in the pleading, and there's a very good reason

17  for that.  You have to remember that LinkedIn is a direct

18  competitor of 3Taps for the monetization of the information on

19  3Taps -- on LinkedIn.  They want to monetize the data on

20  LinkedIn, and we want to monetize the data too.  And we have a

21  plan to do that but --

22       **THE COURT:**  You don't have to give away exact details, but

23  something.  I still don't have any idea what it is and how

24  close you've come to actually commercializing whatever you're

25  planning to do.  I mean --

1       **MR. CHRISTOPHER:**  Well, we know -- I'll tell you this.

2       And just to finish my point, we're okay -- we think that

3   kind of information belongs in an attorneys'-eyes-only

4   protective order where LinkedIn can't see it.  We are more than

5   happy, if they want to serve discovery, to get at this.  We'll

6   do a two-tier protective order, and we'll let Ms. Hurst see it.

7   We'll let the Orrick firm see it.

8       But LinkedIn can't know our business plans and they can't

9   know who our prospective customers are.  They are much bigger

10  than us.  They are much better resourced.  And they are a

11  competitor for those opportunities, and they can get there and

12  take them away from us.  And we've said, sort of, what we think

13  is as much as we can possibly say without hinting to the

14  LinkedIn people what exactly the business plan is, because we

15  don't want them to know the business plan.

16      We'll tell Orrick.  Orrick can know.  Your Honor can know

17  *in camera*.  But we don't want LinkedIn to know, and that's why

18  we don't want to put it in a pleading.  They could destroy our

19  business.

20      **THE COURT:**  Have you described -- and let me pull up the

21  complaint -- what other things -- you say, "This is all we do."

22  Is there a description of some of these other things your

23  company, your client does?

24      **MR. CHRISTOPHER:**  Well, no.  We scrape data, and we find

25  ways to monetize it.

1    **THE COURT:**  Well, I know.  But I mean, can you give some

2    examples so I know -- one knows this is --

3    **MR. CHRISTOPHER:**  Well, I can --

4    **THE COURT:**  -- reality and not -- this is really a

5    business and not just --

6    **MR. CHRISTOPHER:**  Oh, absolutely, Your Honor.  We have

7    proof of that.  And that is, we have been -- we're one of the

8    most well-known data scrapers in the world; and we've been

9    involved in very, very high-profile litigation over our

10   scraping.  And that's the *Craigslist* case that went on

11   for years in front of Judge Breyer.

12   Craigslist sued us for scraping them.  They didn't do that

13   because we were imaginary and don't scrape people and just talk

14   about scraping people but don't do it.  The reason Craigslist

15   sued us and dragged us through all that litigation is we're

16   real live data scrapers.  We scraped Craigslist.  We absolutely

17   did.

18   And that's why there's all this publicly available

19   information out there about us and the case law that

20   Judge Breyer wrote and other things about our data scraping.

21   So we are a real business.  We're probably the best-known data

22   scraper in the world.

23   **THE COURT:**  All right.  Ms. Hurst, could you respond to

24   that?

25   **MS. HURST:**  Yes, Your Honor.  Thank you.

1    Your Honor, first, I'd just like to point out that the

2    circumstances in *MedImmune* were very, very different from the

3    circumstances here.  In that case, as the Court noted, there

4    was a product already on the market.  And it was 80 percent of

5    the company's revenues that were implicated by the dispute over

6    the validity of the Cabilly II patent in that case, Your Honor.

7    And that is just -- in that context, to have a dispute over

8    whether the patent was valid and whether the license had to be

9    complied with is very, very different than what we've -- what

10   we have here.

11        **THE COURT:**  All right.  So that's a simple case.  That

12   doesn't mean that's the only case.

13        **MS. HURST:**  No, Your Honor.  And I do want to point out a

14   couple of other cases, Your Honor.

15        On the question that the Court was just asking

16   Mr. Christopher about the concreteness of the plans,

17   Your Honor, the *Merit Health Care* case from the

18   Ninth Circuit -- which is not precedential because it's

19   unpublished, but it is very instructive in its description of

20   the facts.  Your Honor, that case says -- it's a trademark

21   case, Your Honor.

22        The complaint identifies various trademarks and trademark

23   applications used on various products, but does not identify

24   which marks are used on which products sold to which customers

25   through which trade channels and in which geographical trade

1   areas.

2        The complaint makes no mention of any customers, trade

3   channels, geographical trade areas of overlapping use.  And to

4   the extent there is any similarity of marks, the parties have

5   coexisted for 30 years without conflict.

6        Your Honor, the Court goes on to point out that a rights

7   holder has no obligation to spend the time and money to test a

8   competitor's product or to make a definitive determination, at

9   the time and place of a competitor's choosing, that it will

10  never bring suit.

11       In other words, LinkedIn, Your Honor, is not required,

12  when it has hundreds and hundreds of scrapers, to pursue each

13  and every one of them.  And it had no plans whatsoever, as it

14  made clear in its correspondence, Your Honor, to pursue 3Taps

15  at the time 3Taps initiated this discussion.

16       And, Your Honor, in the *Millennium Laboratories* case,

17  the Court pointed out that a back-and-forth of attorney

18  correspondence suggests there may be a difference of opinion,

19  but this is not a significant factor demonstrating immediacy.

20       And so what's lacking from the correspondence, Your Honor,

21  is the type of coercive threat that *MedImmune* identified.

22  Your Honor, the Court, throughout the *MedImmune* opinion, uses

23  that coercive threat of enforcement language to justify

24  declaratory relief standing in a private civil case.  You know,

25  the Court looks at what is it, in a case where there's

 1   potentially criminal enforcement by the Government, that you

 2   can find in a civil action to justify finding a dispute; and

 3   the Court repeatedly uses the words "coercive threats."  And

 4   that just wasn't present here, Your Honor.

 5       So what don't we see in this complaint?  And I think

 6   the Court's last question to Mr. Christopher was a really good

 7   one.  What is the company's annual revenues in its scraping

 8   business?  What type of monetization is it already engaged in?

 9   How is it conducting its business in a way that certainly must

10   be at least somewhat publicly available information?  All of

11   these facts to indicate that there's a real business here

12   rather than -- rather than just a lawsuit.

13       And what was really telling about Mr. Christopher's

14   response is that he didn't point to any kind of business.  He

15   pointed, again, to another lawsuit.

16       Now, Your Honor, this case has been pending for more than

17   four years.  And the standing requirement requires harm.

18   Requires harm.  In that four years, 3Taps has not embarked on

19   whatever it claims it wants to do here.

20       And, Your Honor, not only has it not done that in the last

21   four years, but in the CMC statement, 3Taps proposes to

22   continue an indefinite stay on any resolution of this motion to

23   dismiss and on this case, which means it doesn't intend to

24   commence doing whatever it was that it wouldn't disclose,

25   you know, in its complaint any time soon.

1      Your Honor, that level of delay completely undercuts any

2   notion of meaningful harm that's required for injury, that is

3   required for redressability.

4      Your Honor, I'd also like to separately address the

5   redressability point, but I think I've gone probably beyond

6   your question at this point so I'll stop.

7      **THE COURT:** All right.  I'll let you respond,

8   Mr. Christopher, to that.

9      **MR. CHRISTOPHER:**  Yeah, I'd like to respond to all of

10  that.

11     You know, Ms. Hurst referred to a case in which customers

12  were not identified, and the Court faulted the plaintiff for

13  that.  But remember, this is a litigation among direct

14  competitors for the monetization of the data on LinkedIn.

15  We're not going to put it in a pleading.  We're not going to

16  tell them who our customers are, our potential customers are.

17     They can get to the data faster.  They're bigger, better

18  resourced, and they can undercut us.  They take those

19  opportunities away from us.

20     We can put that in an attorneys'-eyes-only protective

21  order.

22     **THE COURT:**  Why not file a portion of the complaint, a

23  redacted complaint that's publicly redacted, but the unredacted

24  version that has some specificity, seek to file it under seal,

25  for attorneys' eyes only, so that the attorney, Ms. Hurst and

```
1   her firm, can look at it and respond on behalf of LinkedIn and
2   yet not necessarily share that with decision-makers in terms of
3   the business plan?  How about that?
4        MR. CHRISTOPHER:  No problem.
5        THE COURT:  Well, maybe that's a simple solution, because
6   that way, three of us can argue, then, at that point.  May have
7   to do it under seal if I think it's worthy of under seal.  But
8   at least then I can assess immediacy and concreteness and
9   meaningful preparation.  Because right now, I can't assess it,
10  and you're sort of telling me:  Well, I can't share it with you
11  because I --
12       MR. CHRISTOPHER:  Well, I can share it with you,
13  Your Honor.  I just can't --
14       THE COURT:  All right.  Yeah, but this is not -- I don't
15  like to do ex parte things.  But there's a way of doing it, as
16  often happens in patent cases and such.
17       Any reaction to that, Ms. Hurst?  What about if I dismiss
18  with leave to amend, and Mr. Christopher can then resort to --
19  if he really needs to, in order to get the level of specificity
20  that he contemplates that the Court is looking for, can file
21  that portion under seal for your eyes, attorneys' eyes only, at
22  least to get through this stage and see if there's enough
23  there?
24       MS. HURST:  Your Honor, I'm deeply skeptical.  And,
25  you know, obviously, we would prefer that this be dismissed
```

1    fully and finally.  If the Court thinks that Mr. Christopher

2    has articulated enough to meet the standard, you know, or it

3    wants to further evaluate that, I can understand why the Court

4    might do so.

5        Let me make a -- let me make a plea here to the Court on

6    discretionary grounds.  Your Honor, this is --

7        **THE COURT:**  Yes.

8        **MS. HURST:**  -- an entirely declaratory relief claim.

9        The Court has discretion whether to entertain it or not.

10   And, Your Honor, this is a bad type of case to exercise

11   categorical discretion in this kind of a situation because,

12   basically, what you have here is two private civil litigants

13   where one of them is trying to seek judicial preclearance of a

14   business model.

15       This is not, I would submit, Your Honor, a good use of

16   the Court's resources.  The Declaratory Judgment Act is

17   supposed to be used sparingly.  And for businesses to say

18   "Okay; well, we might have a dispute if we do this, and I'm

19   going to run to court first every time" is just not a good use

20   of either the Court's or the litigants' resources.

21       Your Honor, I'm also frankly concerned here because

22   there's a bit of a pattern of playing fast and loose with the

23   facts.  And, you know, this whole circumstance where 3Taps

24   alleged that this case arose from the *hiQ* case, when that

25   business relationship was entirely manufactured in response to

1    the Court's injunction, is deeply concerning, Your Honor.

2          And, you know, 3Taps went out and bought a piece of hiQ

3    after the Court issued its injunction, and then sent this

4    letter, provoking LinkedIn to assert its legal position.

5          And the one thing, Your Honor, that the Court -- that

6    3Taps has never said is that it would seek relief regarding the

7    user agreement.  And so there's clearly all of these claims

8    that could be brought.  And the breach of the user agreement

9    claim is an important one that would be central to the type of

10   dispute that Mr. Christopher claims to be litigating here on

11   behalf of 3Taps; and yet, not in any of the prior complaints

12   that they've filed have they sought a declaration regarding the

13   user agreement.

14         And that really goes to this point of redressability,

15   Your Honor.  They're not seeking complete relief.  Why on earth

16   would 3Taps go to the lengths of filing two complaints and not

17   seek to redress the one claim that is the most obvious claim,

18   the clearest claim, and the one that would be central to all of

19   the other statutory and tort allegations?

20         And, Your Honor, the reason for that is clear if we look

21   at the prayer.  The prayer seeks a very broad advisory opinion

22   that scraping is okay under a federal statute and state statute

23   in a common law tort theory.  And that's the agenda here.

24         And what they are trying to do is create a safe harbor for

25   an existing permanent injunction.  And, Your Honor, I would

1  just respectfully submit that that's not a good use of

2  this Court's discretionary resources.  They're not seeking to

3  redress all of the potential disputes here, none of which, by

4  the way, LinkedIn has indicated any intention of bringing

5  against 3Taps.  And instead, what they're doing is seeking a

6  safe harbor from an existing permanent injunction.

7        **THE COURT:**  All right.  Well, let me ask, Mr. Christopher.

8  What we're hearing is that, even if you were to prevail on a

9  declaratory relief claim for no violation of the CFAA, no

10 trespass, et cetera, but you've got the user agreement cause of

11 action -- potential cause of action, which could end up putting

12 your client in the same space and not really advance their

13 position, why should this Court exercise declaratory relief on

14 a partial -- partial judgment that it may have no effect at the

15 end, no real-world effect?

16       **MR. CHRISTOPHER:**  Two things, Your Honor.

17       Number one, scrapers fear the CFAA; they don't fear breach

18 of contract claims.  These are materially different causes of

19 action with materially different damage remedies and

20 consequences.  The CFAA and the other things we're talking

21 about have catastrophic business-destroying damage

22 calculations.  That -- you cannot compare that to a breach of

23 contract claim under which, arguably, LinkedIn has absolutely

24 no damages.

25       If it is that important -- I'm amending anyway; Your Honor

1  has said we can do an amended complaint -- we'll put that in
2  there too.  No problem.  This is all easily fixed and could
3  have been easily fixed.
4       **THE COURT:**  All right.  I'm going to grant the motion to
5  dismiss for lack of specificity, particularly on the meaningful
6  preparation prong of standing, but I'm going to give leave to
7  amend within 30 days.  And I will allow in advance, I'll give
8  permission in advance to the plaintiff to file some portion of
9  that under seal for attorneys' eyes only, but with the right of
10 defense counsel to see it, but not to share with the client yet
11 until further order so that the counsel can respond with
12 respect to whatever motion they're going to bring.  And so
13 we'll see what that looks like.
14      I think you know what the issues are at this point, what
15 you're going to be facing, Mr. Christopher.  There's both the
16 redressability question as well as a standing question here.
17 So I guess we will meet again, is my guess.
18      **MR. CHRISTOPHER:**  Yes, Your Honor.
19      One quick request, Your Honor.  May I have 40 days instead
20 of 30?  We have --
21      **THE COURT:**  Sure.
22      **MR. CHRISTOPHER:**  I have a client traveling and kids
23 headed to spring break here shortly.
24      **THE COURT:**  Yes, that's fine.  40 days.  You got it.
25      **MR. CHRISTOPHER:**  Thank you, Your Honor.

1          **MS. HURST:**  Thank you, Your Honor.

2          **THE COURT:**  All right.  Thank you, Counsel.  Thank you.

3          **MS. HURST:**  Thank you.

4                    (Proceedings adjourned at 2:29 p.m.)

5                           ---o0o---

6

7                    <u>**CERTIFICATE OF REPORTER**</u>

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:  Wednesday, July 20, 2022

12

13

14   _____

15   Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                Official United States Reporter

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 22
# FILED UNDER SEAL

# EXHIBIT 23

## Contact

www.linkedin.com/in/gregkidd
(LinkedIn)

## Top Skills

Classifieds

Financial Services

Transportation

## Publications

Craigslist By the Numbers

# Greg Kidd

Co-Founder + Director @ GlobaliD

Crystal Bay, Nevada, United States

## Summary

Believer that one's identity credentials should be truly portable and owned by individuals themselves rather than corporations or governments.  The trade-off between security and privacy can meet the needs of both traditional institutions worried about compliance and risk, but also consumer protection advocates who care about the underserved and underbanked.

Advisor/Investor via hardyaka.com for numerous startups in the exchange space including Shift, Ripple and 3taps, and previously Square and Twitter.  Previously a director at Promontory Financial and a senior analyst for payments at The Board of Governor of the Federal Reserve.  Senior Associate at Booz Allen. Founded and took Dispatch Management Services Corp public on the NASDAQ. Have worked as an instructor/leader for Outward Bound and the National Outdoor Leadership School.

Specialties: Portable identity, digital currencies and exchange markets for goods, services, and information with functional emphasis on messaging, payments, and reputation/trust/risk. Well versed in visualizations for risk reporting and controls.

———

## Experience

### Hard Yaka

Chief Executive Officer

2010 - Present (12 years)

Crystal Bay, Nevada, United States

Hard Yaka makes early round investments in exchange space startups. Candidates are either verticals in particular categories of exchange markets or horizontals providing services (i.e. messaging or payments) across exchange sectors. Portfolio includes  Shift, Ripple, GateHub, Stockpile, Ledger X, Tradeblock, Blockscore, Marqeta, Coinbase, Ribbon, Coin, Twillio, Mighty Text, Hailo, Kabbage, 3taps, Square, Twitter.

## GlobaliD
Director
January 2016 - Present (6 years 10 months)
San Francisco Bay Area

GlobaliD is the neutral and portable identity framework that allows individuals
and entities to securely and privately manage all their permissions and money.
Attestations about identity (rather than the underlying personally identifiable
information) are placed on an open and accessible public ledger for all to
see and use. GlobaliD eliminates the need for silo based customer account
systems, and the equally silo based approaches to compliance and risk
management

## Apto Payments
Co-Founder
May 2014 - Present (8 years 6 months)

## True Global Ventures
Founding Partner
September 2019 - Present (3 years 2 months)

True Global Ventures 4 Plus (TGV) has invested in 3 unicorns, namely
Animoca Brands, The Sandbox, and Forge. TGV GP contributions represent
between 20-40% of total fund AUM. The fund invests across 3 verticals in
web3: Entertainment, Financial Services, and Infrastructure & Data Analytics/
AI. TGV is licensed under the Monetary Authorities of Singapore.

## Ripple Labs
Chief Risk Officer
2013 - 2015 (2 years)
San Francisco

Navigating the fraud, compliance, regulation, and reputational challenges of
digital currencies and currency exchanges.

## Promontory Financial Group, LLC
Consultant / Director
2004 - 2013 (9 years)

Consultation on risk with an emphasis on reporting and  visualization of risk
metrics.  Emphasis on transaction, servicing, and credit intensive sectors.
BSA/AML, Privacy, and Compliance sub-specialties.

## Federal Reserve Board

### Senior Analyst
2002 - 2004 (2 years)

Senior analyst in payment systems.  Focus on check and ACH clearing systems as well as private sector money transfer systems.

### Dispatch Management Services Corp / dNet
Founder and Chairman
1991 - 2001 (10 years)
New York, London, San Francisco, Wellington

Created dispatch software and clearing house for messenger deliveries in major metro areas around the world.  Nasdaq IPO.  Revenues of $250M per year, staff of 6,500 and 62 completed acquisitions across three continents.

### Booz Allen Hamilton
Senior Associate
1984 - 1990 (6 years)
New York, Singapore, Sydney, Wellington, San Francisco

Focus on transaction processing intensive industries: telecoms, financial services, transportation. Emphasis on economic modeling and strategy. Clients included Sprint, Citibank, Amex, etc.

### National Outdoor Leadership School
Leader
1979 - 1990 (11 years)
Lander Wyoming, Alaska, Mexico

Instructor of mountaineering and sea kayaking courses

### Hurricane Island Outward Bound School
Instructor / Logistics Director
1976 - 1982 (6 years)
Green and White Mountains

Instructor for cycling and winter mountaineering course.  Logistic manager for Dartmouth Outward Bound

### Vermont Bicycle Touring
Leader
1979 - 1981 (2 years)
Vermont

Led inn to inn bicycle trips

———

## Education

### Harvard University Kennedy School of Government

MPA, Public Policy · (2001 - 2002)

### Yale University

MBA, Operations Research, Strategy, Organizational Behavior, Game
Theory · (1982 - 1984)

### Stanford University

No Degree, Human Computer Interface (HCI) · (2009 - 2010)

### Brown University

AB, History: Thesis -- Historical Origins of Supply Side
Economics · (1979 - 1981)

# EXHIBIT 24
# FILED UNDER SEAL

# EXHIBIT 25
# FILED UNDER SEAL

# EXHIBIT 26
# FILED UNDER SEAL